**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **NATHANIEL POLLEY, NANCY QUIROZ, SURYA VEERAVALLI, and DANIEL GREENWALD, on behalf of themselves and all others similarly situated,** | |
| **Plaintiffs,** | **Case No. 20 C 4798** |
| **v.** | **Judge Harry D. Leinenweber** |
| **NORTHWESTERN UNIVERSITY,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

A number of current and former students at Northwestern University have brought this action against their alma mater on behalf of themselves and others who attended virtual classes during the 2020 and 2021 school years. Plaintiffs allege that the decision to move to virtual schooling was a breach of contract, or, in the alternative, unjust enrichment. (Dkt. No. 20.) Northwestern has moved to dismiss the Consolidated Class Action Complaint. (Dkt. No. 26.) In response, Plaintiffs moved to strike Paragraphs 7 through 13 and Exhibit 8 to the Declaration of Jacqualyn Casazza, Exhibit 2 to the Declaration of Mudita Rastogi, and Exhibits 2, 6, and 7 to the Declaration of Jonathan Yates, and all corresponding arguments in Northwestern's memorandum. (Dkt. No. 40.)

For the reasons stated herein, Plaintiffs' Motion to Strike is denied in part and granted in part, and Northwestern's Motion to Dismiss is granted. The case is dismissed without prejudice

## I.   BACKGROUND

On March 11, 2020, the World Health Organization ("WHO") officially held that the ongoing spread of COVID-19 was a pandemic. March 11, 2020: 'The day everything changed' (March 11, 2021) *https://abc7chicago.com/march-11-2020-covid-us-coronavirus-covid-19-pandemic/10406695*. On March 20, 2020, Illinois Governor JB Pritzker ordered Illinois citizens to stay at home and ordered all non-essential activities to cease. ILLINOIS OFFICE OF THE GOVERNOR, *Executive      Order      2020-10* (March      20,      2020), *https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder 2020-10.aspx*. Northwestern University, along with many other schools in Illinois, decided to divert their college courses to online instruction instead of in-person gatherings. *See, e.g., Buschauer v. Columbia Coll. Chicago*, No. 20 C 3394, 2021 WL 1293829 (N.D. Ill. Apr. 6, 2021), *Oyoque v. DePaul Univ.*, No. 20-3431, 2021 WL 679231 (N.D. Ill. Feb. 21, 2021); *Gociman v. Loyola Univ. of Chi.*, No. 20-3116, 2021 WL 243573 (N.D. Ill. Jan. 25, 2021). The plaintiffs to this lawsuit argue this decision to move to virtual education was an express or implied breach of their contract.

Northwestern University is private research university with over 8,000 undergraduate students and 13,000 graduate students enrolled in the 2019-2020 academic year (Compl. ¶ 17.) Northwestern operates on two primary campuses, one in Evanston, Illinois, and the other in the Streeterville neighborhood of Chicago, Illinois. (*Id.* ¶¶ 25, 30.) As part of its marketing strategy, Northwestern advertises its on-campus and in-person experiences and opportunities through its "website, promotional materials, circulars, admission papers, and publications." (*Id.* ¶¶ 22.)

In these advertisements, Northwestern describes itself as "an innovative, collaborative, and multidimensional community." (*Id.* ¶ 24.) Northwestern advertises Evanston's campus as "240 acres of natural beauty" with "beaches, shops, coffee houses, restaurants, and theaters just down the street from classrooms, labs and lecture halls." (*Id.* ¶¶ 26–27.) The Streeterville campus is located in the "global city" of Chicago and "close to the attractions such as the Magnificent Mile, the Museum of Contemporary Art and the John Hancock Center." (*Id.* ¶ 30.) As part of its recruitment strategy, Northwestern offers an "online guided tour for an interactive 360-view of the Northwestern campus." (*Id.* ¶ 31.) Northwestern also extolls the value of campus life in its promotional literature. (*Id.* ¶ 32.) Plaintiffs provide the example of the Sound Arts and Industries Master of Arts program, which states that persons

enrolled in the program "have hands-on experience with the latest audio production technology" and "take advantage of Northwestern's state-of-the-art sound facilities." (*Id.* ¶ 33.)

Northwestern also offers catalogues of classes that list the location and time of meetings. (*Id.* ¶ 37.) Plaintiffs provide an example of this promise by including the online class description of Astronomy 220, "Introduction to Astrophysics," an entry from which displays information about the class instructors, the teaching method, the registration requirements, the evaluation method, and the class materials, as well as the meeting information, i.e., the Technological Institute in Room L361 on Monday, Wednesday, and Friday from 2:00 PM – 2:50 PM. (*Id.* ¶ 37.) Similar information on location and time and meeting of each class can be found in Northwestern's Course Catalogs. (*Id.* ¶ 38.)

Plaintiffs allege that these promotional and informational statements created an express or implied contract between themselves and Northwestern such that they would receive in-person instruction and access to physical spaces in exchange for the payment of tuition, fees, and other related costs. (*Id.* ¶ 35.) Plaintiffs pinpoint the acceptance of a student's admission letter, indicated by the payment of the deposit and the promise to pay tuition and other fees, as the formation of a contract. (*Id.* ¶ 42.) Plaintiffs allege the admission letter "promises live, in-

person education at one of Northwestern's actual campuses, not an 'online' education at a 'virtual' campus." (*Id.* ¶ 43.)

Plaintiffs also point to Northwestern's Faculty Handbook, which states: "faculty members are expected to be in residence and available to students and colleagues throughout the period of their appointment" (*Id.* ¶ 49.) The Faculty Handbook differentiates between an in-person credit hour which is calculated as "one hour of classroom or direct faculty instruction and a minimum of two hours of out of class student work" and "online and blended classes" which receive "one unit of credit when at least nine full hours of work per week are expected of the student." (*Id.* ¶¶ 51, 55.) Plaintiffs allege that "Northwestern did not comply with its own standards" by altering the contractual obligations of its faculty during the pandemic. (*Id.* ¶ 54.)

Northwestern University operates on a quarter system, which, for a full-time student, encompasses a fall quarter, a winter quarter, and spring quarter. On March 11, 2020, Northwestern announced it had cancelled all classes from March 31, 2020, until April 3, 2020, and moved the last quarter of the year to remote learning online. (*Id.* ¶ 58.) Plaintiffs allege that this breached their contract with Northwestern. Plaintiffs further allege that on June 15, 2020, Northwestern announced that a "significant

portion" of its classes for the Fall 2020 quarter would be online with drastically reduced on-campus experiences. (*Id.* ¶ 62.)

Plaintiffs allege that Northwestern differentiates between in-person and online instruction and provides the following example. For the 2019-2020 school year, tuition at the Medill School of Journalism was $18,744 for a full-time student, who could take three or four units; $6,121 per unit for a part-time student, or $4,665 per unit for an online student. (*Id.* ¶ 74.) On a per unit basis, a full-time student would pay between $6,248 (for three credits) or $4,686 (for four credits). On a per credit hour basis, online students pay approximately $21 less per hour than a full-time student taking four credit hours, $1,583 less per hour than a full-time student taking three credit hours, and $1,456 less per hour than a part-time student. Given the disparity of pricing between an in-person and online student, Plaintiffs allege that the online learning is "materially different" compared to the educational experiences previously provided.

Plaintiffs enumerate these differences to include previously recorded lectures, lack of classroom interaction, lack of development of strong study skills, the newly instituted ability to receive Pass-Fail for the spring semester when ordinarily Northwestern would have mandated letter grades, lack of collaborative learning, lack of in-person dialogue, and the

inaccessibleness of libraries, computer labs, study rooms, and opportunities for networking. (*Id.* ¶¶ 75-78.) Plaintiffs allege that Northwestern prices its tuition and fees on the in-person campus experience, and a failure to reimburse or otherwise refund a portion of the tuition is required under their contract with Northwestern. (*Id.* ¶¶ 80-82.)

In response to the Complaint, Defendant provided the Court with its communications with the specific students who filed this Complaint. There are four students who allege injury on behalf of themselves and others. Plaintiff Polley graduated from Northwestern in June 2020 with a Master of Science in Biotechnology. (*Id.* ¶ 13.) Plaintiff Quiroz is a current graduate student in the Marriage and Family Therapy program at the Family Institute. (*Id.* ¶ 14) Plaintiff Veeravalli is an undergraduate student who was expected to graduate in June 2021 at the time the Complaint was filed. (*Id.* ¶ 15.) Plaintiff Greenwald enrolled in a Master of Arts program in Sound Arts and Industries for the 2019-2020 school year. (*Id.* ¶ 16.)

With its response, Defendant submitted the attached documents which are contested by Plaintiffs.

### A. Declaration of Jacqualyn Casazza

Plaintiffs move to strike Paragraphs 7 through 13 of the Jacqualyn Casazza Declaration. Casazza is Assistant Provost for

University Records and University Registrar for Northwestern University. (Casazza Decl. ¶ 1, Dkt. No. 29.) In the disputed paragraphs, Casazza states that, prior to enrolling in course and paying tuition and fees for Fall 2020 and Winter 2021 Quarters, Northwestern required students to review and abide by a community expectations agreement, an online form that was part of the registration materials for those quarters. (Casazza Decl. ¶¶ 7–9.) Casazza copies the full language agreed to by each student in Paragraph 10 of her declaration. Casazza then states that Northwestern's electronic records confirm the date and time of each student who completes the form, including Plaintiffs Quiroz, Veeravalli, and Greenwald. As Plaintiff Polley graduated in June 2020, he did not electronically sign the form. (*Id.* ¶¶ 12–13.) Plaintiffs also move to strike Exhibit 8, which is a screenshot of the webpage showing the language replicated in Paragraph 10.

### B. Declaration of Mudita Rastogi

Plaintiffs also move to strike Exhibit 2 to the Mudita Rastogi Declaration. Rastogi is the Director for the Marriage and Family Therapy Program for the Family Institute at Northwestern University. (Rastogi Decl. ¶ 1, Dkt. No. 31.) The disputed exhibit is "a true and correct copy of an email from the former Program Director, which was distributed to all incoming students, including Quiroz, on July 16, 2020." (*Id.* ¶ 3.) Exhibit 2 states

that the Marriage and Family Institute determined it would remain virtual for the 2020 Fall Quarter. (7/16/2021 Breulin Letter, Ex. 2, Rostagi Decl., Dkt. No. 31-2.)

### C. Declaration of Jonathan Yates

Finally, Plaintiffs move to strike Exhibits 2, 6, and 7 to the Jonathan Yates Declaration. Yates is Assistant Vice President of Communications at Northwestern University's Global Marketing and Communications Office. (Yates Decl. ¶ 1., Dkt. No. 34.) Exhibit 2 is an email that was sent to all students on March 12, 2020, entitled "Remote learning resources." (*Id.* ¶ 3.) Exhibit 6 is an email sent to "all Northwestern undergraduate students who were registered or eligible to register for Spring 2020 Quarter courses" on March 31, 2020, entitled "Undergraduate Spring Quarter Grading and Policy." (*Id.* ¶ 7.) Exhibit 7 is an email sent to all Northwestern graduate students on March 31, 2020 and subsequently posted publicly on Northwestern's website, entitled "Graduate Spring Quarter Grading and Policy." (*Id.* ¶ 8.)

## II. <u>ANALYSIS</u>

### A. Motion to Strike

On a motion to dismiss, the court reviews the four corners of a complaint, with limited exceptions. *See* FED. R. CIV. P. 12(d). When moving under Rule 12(b)(6), a motion can be based "only on the complaint itself, documents attached to the complaint,

documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). If the Court reviews documents beyond the scope of these strict exceptions, the motion is converted into a motion for summary judgment under Rule 56. FED. R. CIV. P. 12(d). The purpose of including the "incorporation by reference" as an exception to this general rule is "to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). This exception is specifically "aimed at cases interpreting, for example, a contract." *Id.* (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir.1998)).

Plaintiffs contest the inclusion of three portions of Defendants submissions that accompany its briefing. First, Paragraphs 7 through 13 of the Jacqualyn Casazza Declaration, as well as Exhibit 8 to the Declaration, are communications regarding the requirement that students sign a "Community Expectations Agreement" prior to enrolling in the Fall 2020 and Winter 2021 academic quarters, as well as a copy of the actual agreement itself. Second, Plaintiffs' object to the inclusion of a letter sent to all incoming Marriage and Family Institute students on July 16, 2020, included as Exhibit 2 to the Rastogi Declaration.

- 10 -

Finally, Plaintiffs' object to a series of emails, the first dated March 12, 2020, and the second and third dated March 31, 2020, sent to all students to communicate the changes to the Spring 2020 semester.

As anticipated by the narrow exception to Rule 12(f), if a contract explicitly references terms in another document, that second document is incorporated into the contract. *See, e.g., 188 LLC*, 300 F.3d at 735 (holding a document was incorporated by reference when the contract contained the statement, "Sales of all services and materials are subject to the general terms and conditions on the reverse side").

One of Plaintiffs' objections falls within the express references of Plaintiffs' complaints. In the Complaint, information contained within the Northwestern Undergraduate Spring 2020 Course Catalog is cited "as an example" of Northwestern's implied contractual promises, and excerpts of the Catalog are included in the text of the Complaint. (Compl. ¶¶ 37–38.) Plaintiffs state that the Course Catalogs generally create this promise, and then allege an ongoing injury from Spring 2020 to present. Defendant's Exhibit 8 to the Casazza Declaration, the Community Expectations Agreement, is printed in full in the Northwestern Undergraduate Fall 2020 Course Catalog. (Caza Decl. ¶ 8.) Although Plaintiffs referenced the Spring 2020 Catalog, and

- 11 -

the disputed Community Expectations Agreement is present only in the Fall 2020 and subsequent Catalogs, Plaintiffs' reference the Course Catalogs generally, and assert ongoing injury, encompassing the Fall 2020 Course Catalog as part of their complaint.

Plaintiffs' main objection to the inclusion is to note that the Community Expectations Agreement is only present in the Undergraduate Fall 2020 Catalog, and not the Graduate Fall 2020 Catalog. In this suit, one class member is an undergraduate student, the putative class includes undergraduate students, and the excerpted Catalog from the complaint is an Undergraduate Catalog. The Court thus incorporates all course catalogs, including those that have the Community Expectations Agreement. As a result, the included Community Expectations Agreement is properly considered by this Court, and the motion to strike Exhibit 8 of the Casazza Declaration is denied.

The other objected to Exhibits and Declaration Paragraphs are referenced only obliquely. Plaintiffs allege the following communications in Paragraph 36 and 99 of the Complaint constitute the express or implied contract between themselves and Northwestern:

> 36. Northwestern's promise to provide in-person and on-campus educational services can be found in material materials, application materials, admission matters, registration materials, and other documents that detail and reference the services that Northwestern agreed to

provide and make available in exchange for the payment
of tuition and fees.

. . .

99. Through its school policies, course catalog, course
schedule, representations, admission agreement,
acceptance letters, registration materials, and payment
of tuition and fees, Plaintiffs and each Class Member
entered a binding contract with Northwestern.

(Compl. ¶¶ 36, 99.) Plaintiffs allege the sum of communications

between Northwestern and its student body creates a promise for in

person classes, but that post-admission email communications are

not part of that contract. Specifically, Plaintiffs' object to (1)

the emails distributing and requiring agreement to the Community

Expectations Agreement, (2) a July 16, 2020 email notifying Family

and Marriage students that their program would remain remote for

Fall 2020, and (3) March 12 and March 31, 2020 emails notifying

students that the school would be virtual for the Spring 2020

quarter.

In *Wilk v. McDonough*, 124 F.3d 206 n.2 (7th Cir. 1997), the

Seventh Circuit considered "performance evaluations [and] other

documents," including "the evaluation procedures form and

affidavits of the plaintiffs" when affirming the district court's

dismissal of an implied employment contract between three summer

lifeguards and the Chicago Park District. Although the documents

were not attached to the initial complaint, the Seventh Circuit

- 13 -

noted that they "were referred to in the complaint and central to their claim," and thus properly considered without converting the motion to dismiss into a motion for summary judgment. *Id.* Unlike here, however, the materials in *Wilk* were submitted by Plaintiffs prior to the response from Defendants. *Id.* As a result, it is clear that they were contemplated and intended to be used by Plaintiffs in the making of their Complaint.

The Court follows the much greater weight of authority which cautions against inclusion of tenuously connected materials supplied by Defendants. *See e.g., Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) ("[The exception] is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment, and the defendants' perfunctory arguments for the centrality of these documents are unpersuasive."); *Tierney v. Vahle*, 304 F.3d 734, 739 (7th Cir. 2002) ("[T]he scope of the exception recognized in the cases we have cited from is uncertain; perhaps it is or should be limited to cases in which the suit is on a contract or the plaintiff, if he has not attached, has at least quoted from, the document later submitted by the defendant."). In the Complaint itself, Plaintiffs do not reference any specific emails Defendants sent as part of the alleged contract. To reach the inclusion of the disputed emails, the Court would have to stretch "registration materials"

- 14 -

beyond its reasonable bounds in order to arrive at Defendants'
conclusion, a step beyond the narrow exception contemplated by
Rule 12(b). For this reason, the Court grants Plaintiffs' motion
to strike these exhibits.

### B.  Motion to Dismiss

Defendants challenge the sufficiency of the complaint under
Federal Rule of Civil Procedure 12(b)(6). *Christensen v. Cty. of
Boone*, 483 F.3d 454, 457 (7th Cir. 2007). A complaint is sufficient
when it states "a claim to relief that is plausible on its face."
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial
plausibility requires facts from which the court can "draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009).
The Court "accept[s] as true all well-pleaded facts alleged, and
draw[s] all possible inferences in [the plaintiffs'] favor."
*Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Plaintiffs plead three alternative scenarios: first, that
Defendants breached an express contract providing for in-person
instruction; second, that Defendants breached an implied contract
to do the same; and third, that there was, at least, unjust
enrichment on the part of Northwestern for not refunding any fees
or tuition. "In Illinois, a breach of contract claim consists of:
1) the existence of a valid and enforceable contract, 2) breach of

the contract by the defendant, 3) performance by the plaintiff, and 4) resulting injury to the plaintiff." *Northbrook Bank & Tr. Co. v. Abbas*, 102 N.E.3d 861, 874 (2018). When interpreting a contract, the "primary objective in construing a contract is to give effect to the intent of the parties." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009) (citing *Vill. Of S. Elgin v. Waste Mgmt. of Ill.*, 810 N.E.2d 658, 670 (2004)). Contracts must not be interpreted in a way contrary to "the plain, obvious, and generally accepted meaning of its terms." *Asta, L.L.C. v. Telezygology, Inc.*, 629 F.Supp.2d 837, 843 (N.D. Ill. 2009) (citing *Krilich v. American Nat. Bank and Trust Co. of Chicago*, 778 N.E.2d 1153, 1164 (Ill. App. Ct. 2002).

### 1. *Educational Malpractice Defense*

Defendants first argue that Plaintiffs' suit ultimately challenges the quality of education received and should be construed as an educational malpractice claim instead of a breach of contract or an unjust enrichment claim. Specifically, Defendants point to language where Plaintiffs argue that the remote instruction was "materially different" compared to the educational experience previously afforded to them. (Compl. ¶ 75.) According to Defendants, this is equivalent to "second-guessing the professional judgment of the University faculty on academic

matters" and thus a not cognizable claim. *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992).

"[C]laims sounding in educational malpractice, that is, claims alleging negligent instruction, are not cognizable in Illinois." *Waugh v. Morgan Stanley & Co.*, 966 N.E.2d 540, 554 (2012). Plaintiffs are barred from asking "a jury at trial to analyze the quality and methods of the education provided . . . as well as an evaluation of the course of instruction and the soundness of the teaching methods." *Id.* As pled, however, Plaintiffs allege that they were promised, either expressly or implicitly, that they would receive in-person instruction. While plaintiffs do compare the costs of in-person versus online education in their complaint, the information can be used as evidence of damages, not as evidence that online education is lacking as compared to its in-person counterpart. To the extent Plaintiffs have implied non-cognizable claims, they are appropriately disregarded. For example, the Court will not determine whether the lack of access to "libraries, computer labs, study rooms," Compl. ¶ 78, creates a qualitative difference between a good educational experience and a poor one. The Court will, however, review the materials provided by Plaintiffs and see whether they plausibly create an entitlement for students to have access to study rooms.

- 17 -

Because the Court is not required to evaluate the University's efforts to educate students, only evaluating the contractual obligations entered into by each party, the Court finds it inappropriate to convert the Complaint into an educational malpractice claim and continues with the contractual framework for evaluating the motion to dismiss.

### 2. *Express Contract*

Generally, the "basic legal relation between a student and a private university or college is contractual in nature." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 601 (7th Cir. 2009) (quoting *Ross.*, 957 F.2d at 416). Plaintiffs first allege that there were express terms in their respective admissions letters that Northwestern would provide the named Plaintiffs with in-person instruction. A review of the admissions letters sent to the named Plaintiffs, however, do not show any promise of in-person instruction. (*See* Polley Admissions Letter, Korzeniowski Decl., Ex. 1, Dkt. No. 30-1; Quiroz Admissions Letter, Rastogi Decl., Ex. 1, Dkt. No. 31-1; Veeravalli Admissions Letter, Watson Decl., Ex. 1, Dkt. No. 32-1; Greenwald Admissions Letter, West Decl., Ex. 1, Dkt. No. 33-1.)

The closest the letters reach to any reference of in-person instruction are in portions that extoll the benefits of entering into a contract with the University in broad terms and are not

concrete enough to be actionable. For example, Veeravalli's undergraduate admissions letter states that "Northwestern will immerse you in an environment with limitless possibilities to learn, make a difference, and define your path for future success. We are confident you will make a significant contribution to the life of the University, both in and out of the classroom." (Veeravalli Admissions Letter) Northwestern cannot be required to present a literal environment of "limitless possibility" as the university is anchored, as we all are, by temporal reality. Nor does reference to students being "in and out of the classroom" create an actionable promise to in-person instruction in physical classrooms.

Similarly, Northwestern's Family Institute admissions letter contains a paragraph attempting to induce acceptance by describing its program of "unquestioned excellence." (Quiroz Admission Letter) The letter continues, "[y]ou will take courses taught by world-renowned faculty, receive extensive supervision and see clients in the Family Institute's own Bette D. Harris Family and Child Clinic." (*Id.*) Plaintiffs argue that the Family Institute Clinic references a physical structure and not a clinical program facilitating student-client interactions. A review of the word "clinic" shows that it is "a class of medical instruction in which patients are examined and discussed," a definition which does not

- 19 -

guarantee a physical location for either the in-person instruction or the meeting of patients. *Clinic,* MERRIAM-WEBSTER DICTIONARY*, https://www.merriam-webster.com/dictionary/clinic* (last visited Sept. 7, 2021). The Court finds the more natural reading to guarantee an education generally, as all the admissions letters state in general terms, and not a specific contractual promise of location. *See Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 388 (7th Cir. 2019), cert. denied, 141 S. Ct. 246 (2020) ("Given the clarity of the vesting language and the coherence of the contractual scheme under the more natural reading of the contract, defendants' position is not persuasive."). As a result, the Court does not find any breach of the express contract.

### 3. Implied Contract

In the alternative, Plaintiffs argue that the sum of communications generally that Northwestern directed towards students created an implied contract of in-person instruction. Students may establish that an implied contract between themselves and a university as to a specific right. *Bissessur*, 581 F.3d at 601. The Seventh Circuit has recognized that "a formal university-student contract is rarely employed and, consequently, 'the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific

terms by implication.'" *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992) (quoting *Wickstrom v. North Idaho College*, 725 P.2d 155, 157 (1986)). In order to do so, students must "first show that the implied contract establishes an entitlement to a tangible continuing benefit." *Bissessur*, 581 F.3d at 602. This requires an identifiable contractual promise the university failed to honor. *Id.*

Plaintiffs cite to Northwestern's website, its regularly updated Course Catalog, and its Faculty Handbook as evidence that a specific contractual promise was created to provide in-person instruction. Each of these, however, fail to create an ongoing entitlement through an implied contract.

Implied contracts are created when "the traditional requirements for contract formation are present. *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (1987). First, the language must be clear enough that the student "would reasonably believe that an offer had been made." *Id*. Second, the statement must be disseminated in a manner consistent with an offer. *Id.* Third, the student must "accept the offer by commencing or continuing" with their end of the bargain, in this case, the payment of tuition and fees. *Id.*

As alleged by Plaintiffs, Northwestern University maintains a public website at the domain *www.northwestern.edu* in order to

advertise its programs to website visitors. These descriptions, however, do not have any language that indicates a guarantee has been made if prospective students accept the offer of admissions. Descriptions of current student experiences, activities and physical access do not guarantee the exact same experiences offered in the photographs, words, and descriptions found on the website. (*See, e.g.,* Compl. ¶ 33 ("Students take advantage of Northwestern's state-of-the-art sound facilities. . .").) An implied contract does not mean that every statement on Northwestern's public website creates contractual obligations for future students to have the exact same experience. Northwestern's campus and student experience has undoubtably changed dramatically since the university's founding in 1851 and will likely change even more dramatically in the next one hundred and seventy years. Absent a specific promise to students, the first condition of implied contracts in Illinois is not met.

The same problem plagues the additional evidence provided by Plaintiffs. Northwestern's Course Catalogs note either that Northwestern "reserves the right to change without notice in any statement in this catalog concerning, but not limited to, rules policies, tuition, fees, curricula, and courses" or that the registration and academic program policies are "subject to change without notice." (Undergraduate Catalog 2019-20 at 8, Casaza

- 22 -

Decl., Ex. 3, Dkt. No. 29-3; The Graduate School Catalog 2019-20 at 10, Casaza Decl., Ex. 5, Dkt. No. 29-5.) As a result, no student could interpret the lists and descriptions of classes as an offer creating a guaranteed entitlement.

Finally, Plaintiffs rely on an internal Faculty Handbook to argue that Northwestern has violated its own policies in allowing credits to change in response to a pandemic. As pled by Plaintiffs, and attested to in Defendants' response brief, the Faculty Handbook is intended to regulate faculty changes to curriculum, and not circulated to students as part of its offer of an implied contract. Because it is not disseminated in a manner consistent with creating a contractual offer, the Court finds it cannot be part of Northwestern's implied contract with its students.

For all these reasons, Plaintiffs have failed to plead that Northwestern breached any implied contractual terms with its students.

### 4.  *Unjust Enrichment*

Plaintiffs plead unjust enrichment in the alternative to their contract claims. Under Illinois law, the relationship between a student and a university is contractual in nature. *Bissessur*, 581 F.3d at 601. "Illinois law does not allow a claim of unjust enrichment where there is a contract that governs the relationship between the parties, unless the claim falls outside

the subject matter of the contractual relationship." *Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*, No. 16 C 7371, 2017 WL 2880899, at \*10 (N.D. Ill. July 5, 2017). Plaintiffs' Complaint for unjust enrichment repeats its claims of contractual obligations, which are subject to the express or implied contractual obligations discussed previously in this opinion and thus are not eligible for unjust enrichment claims.

The only additional allegation for unjust enrichment pleads that the online education had "lesser value" than its in-person counterpart. (Compl. ¶ 115.) Because the Court already held that comparison in value is a non-cognizable educational malpractice claim, the Court cannot grant relief on this ground.

### III.  CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part Plaintiffs' Motion to Strike. (Dkt. No. 40.) The Court grants Defendant Northwestern's Motion to Dismiss. (Dkt. No. 26.) If the Plaintiffs do not submit an amended complaint stating a viable claim within thirty (30) days, the Court will enter judgment in favor of the Defendant.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 9/16/2021